# The Andela Consulting Group, Inc.

**18783 Tribune Street**
**Northridge, CA  91326**

**Thomas A. Tarter**                    **Phone: (818) 488-9101**
**Managing Director**                   **Cell: (818) 414-6685**
**Expert Witness – Banking**            **Email: ttarter@earthlink.net**
**Consulting – Financial and Management**

## EXPERT REPORT

## Faigy Oestreicher, Plaintiff

### v.

## Equifax Information Solutions, LLC; Flagstar Bank, FSB; Experian Information Solutions, Inc., and Transunion, LLC., et al., Defendants

## United States District Court
## Southern District of New York

## Prepared By:

## Thomas A. Tarter
## Signed and Dated November 28, 2023

*Thomas A. Tarter*

# Expert Report of Thomas A. Tarter

## EXECUTIVE SUMMARY

1. Due to COVID-19 Flagstar Bank, FSB (sometimes "Flagstar") approved a Forbearance Agreement for a non-government guaranteed mortgage secured loan which provided Ms. Oestricher with a three month[1] suspension of payments.

2. Although Ms. Oestreocher supplied a hand written letter[2] indicating a COVID-19 caused hardship to Flagstar, contrary to the industry standard and Flagstar's forbearance policy[3], during the forbearance, Ms. Oestreicher did not get the protections of the credit bureau and was not reported as current[4].

3. Consistent with the COVID-19 forbearance credit reporting standard for all[5] loans Flagstar should have reported Ms. Oestreicher's payment history as current for June, July and August 2021.

## INTRODUCTION

I have been retained on behalf of Ms. Oestreicher, through her counsel, Daniel Zemel, Esq., to provide consulting and, if required, expert testimony (direct and/or rebuttal).

As part of my engagement, I have prepared this Report (sometimes the "Report"). Consistent with my practice, this Report is subject to amendment, modification and supplementation based upon documents, facts, further analysis, information and/or testimony that may be provided to me in the future.

In the context and preparation of this Report, although I may use terms and terminology that may have a legal connotation, I am not discussing and/or opining from a legal perspective but rather solely from a business perspective. My use of any legal terms and/or terminology is based upon my education, training and direct experience as those

---

[1] June, July and August 2021
[2] Flagstar00043
[3] Cleary Decl 17:6-9
[4] Since, pursuant to the Forbearance Agreement, no payments were due Ms. Oesrericher was current and not not contractually delinquent.
[5] Government guaranted and non-government guaranteed

terms, terminology and as those words are commonly used in the vernacular, in the ordinary course of business, by business and credit industry professionals who are not lawyers.

## **ENGAGEMENT**

I have been requested to analyze documents and deposition testimony produced, thus far in discovery and conduct research, relative to the actions and conduct of Flagstar Bank, FSB; and to opine (direct and/or rebuttal in written report(s), deposition, mediation and/or trial) as to whether or not Flagstar's credit reporting, corporate governance, and credit administration actions and conduct, relative to Ms. Oestreicher's Forbearance Agreement, conformed to credit reporting industry standards. Although I may also comment on Defendants Experian, Equifax and TransUnion; however, the primary focus of my Report is on Flagstar.

As part of my engagement, I have been requested to address the conduct of Flagstar relative to the Fair Credit Reporting Act ("FCRA") and credit reporting suspended loan payments specified in a Forbearance Agreement.

I have been requested to review the Documents[6], undertake independent research and based upon my review, education, training and experience to formulate observations and opinions pertaining to the following:

- A description for the Court and Jury's consideration of the change in the circumstances and climate for loan modification and forbearance agreements since the mortgage industry collapse in 2007.
- A description for the Court and Jury's consideration of the loan modification and forbearance process.
- Discuss and opine on whether or not, Flagstar's actions and conduct pertaining to credit reporting loan payments during the term of Ms. Oestreicher's Forbearance Agreement conformed to credit industry standards, the FCRA and industry standards.  And, if not, what should the correct reporting have been?

---

[6] Please see the Documents Section of this Report.

- Identify for the Court and Jury's consideration types of damage caused by inaccurately reporting mortgage trade lines during a forbearance can damage a consumer, like Ms. Oestreicher.
- Discuss and opine for the Court and Jury's consideration Flagstar's net worth and net income/profits.

## QUALIFICATIONS

I am the Managing Director of The Andela Consulting Group, Inc. ("ACG"), which is a banking, business, management and corporate finance consulting firm. I have over 50-years of experience in banking, consumer credit, credit damages, debt collection, forbearance agreements, loan modifications, loan workouts, loan servicing including correction of inaccurate or misleading credit reported information, mortgage lending secured by commercial and residential property, credit scoring and credit score models in the business, lending and banking industries including the development of policies, procedures and practices related to commercial and consumer credit, debt collection, loan workouts and the correction of credit reporting errors.

Following the completion of my military service (1965 – 1968), which included duties as a US Army Finance and Accounting officer and as an *ex officio* board member of the Fort Ord Credit Union, I started my professional career at Lloyds Bank California, where I was a Vice President in the Corporate and California Divisions. I also have held executive level management positions at several other financial institutions, including The Sanwa Bank of California, where I was Vice President and Senior Credit Officer for Southern California; at Bank of Los Angeles, where I was one of the founding directors as well as President and Chief Executive Officer; at Center National Bank, where I was a Director, President and Chief Executive Officer; and at First Los Angeles Bank, where I was an Executive Vice President. I have served on the boards of non-profit corporations that have included L.A. Free Net, Hope Foundation, and Los Angeles Bankruptcy Forum.

As an expert, I have been retained in excess of 2,,000 matters on commercial and consumer credit, debt collection, corporate governance, credit damages, credit reporting, and underwriting, compliance, disclosures, lender liability, dispute resolution, loan workouts, securitization, mortgage lending customs, standards and practices, record

retention practices/standards and other banking and credit industry issues. In doing so, I have testified in arbitration, deposition and/or trial in excess of 300 times and I have been qualified by federal, state and bankruptcy courts as an expert on commercial and consumer credit, damages, disclosures, interest rates, lending industry practices, lender liability, loan origination, loan servicing and/or other banking and financial service company issues including in: Arizona, California, Connecticut, Guam, Illinois, Massachusetts, Michigan, Ohio, New Jersey, New Mexico, New York, Nevada, Oregon, Pennsylvania, Rhode Island, Saipan, Texas, Utah, Washington and West Virginia.

I have significant experience in commercial and consumer credit, business and consulting inclusive of the matters set forth in this Report pertaining to consumer credit, credit reporting, credit damages, loan servicing, loan workouts and dispute resolution. Included in my experience was my appointment to the board of directors of First Alliance Mortgage Company ("FAMCO"). I served on FAMCO's board during its bankruptcy proceedings as an independent outside director and Chair of its Audit Committee. Prior to my board appointment, FAMCO was alleged to have engaged in predatory lending schemes and unfair and deceptive loan disclosure and lending acts and practices by various state and federal authorities including the Federal Trade Commission. FAMCO filed for bankruptcy protection and subsequently entered into settlements with various parties including the Federal Trade Commission.

I have also served as a Court approved reorganization expert for the Bank of Saipan; as the common stock trustee for Marin Outdoor; and on the Boards of Directors of American Standard Development Company ("American"), Southern California Industrial Properties ("SCIP") and MFT Development Company ("MFT"). American, SCIP and MFT were real estate development companies.

My work with the foregoing businesses, banks and financial institutions and the FDIC, as well as with ACG, has included among other things: (i) determination of appropriate interest rates, terms and conditions for commercial and consumer loans; (ii) developing and implementing credit and loan policies for loan origination: (iii) loan underwriting and due diligence; (iv) hedging; (v) analyzed financial markets in connection with interest rates for commercial and consumer credit; and (vi) negotiating (from both the borrower and lender perspective) and reviewing the origination of

consumer and commercial loans consistent with the credit policies and the standards of various lending institutions[7].

During my banking and consulting career, I served as a member of the Officers Loan Committee at the banks for which I worked, except for Lloyds Bank California, where I frequently attended and participated in loan committee meetings and as an advisor to United Mortgage. Accordingly, I have extensive experience with mortgage secured lending practices relating to individuals and businesses. My lending experience has included the extension of more than $1.0 billion in loans (consumer and commercial which includes commercial residential secured loans).

I meet and speak with bankers, business professionals, peers, lenders and regulators on a regular basis concerning commercial and consumer credit, debt collection, loan workouts, credit reporting, current pricing trends, interest rates, loan underwriting standards, loan servicing, securitized lending transactions and the cost of money. In this regard, I deal with many types of lenders including banks, thrifts, savings banks, commercial finance companies, mortgage companies, mortgage servicing companies and private and public real estate investors. This often involves discussing with clients lender liability, credit damages, real estate secured loans, underwriting criteria, loan servicing, loan work outs, forbearance agreements, interest rates, fees, terms and conditions, risk management and credit reporting.

As a prior financial institution officer, senior executive and board of director member of three companies involved in real estate development, I have considerable experience in commercial and consumer credit related issues such as those involved in this matter. Since 1993, I have advised ACG's clients and served as a consultant (including litigation) regarding the above subject matters.

I have been an appointed a member of the panel of mediators, the United States Bankruptcy Court, Central District of California since 1995[8],.

In 1965, I received a Bachelor of Science degree in business from the University of California, Los Angeles. In 1969, I received a Master of Business Administration degree, with a specialization in finance, from the University of Santa.

---

[7] Including but not limited to Bank of America, Citibank, HSBC, JPMorganChase, US Bank, Union Bank, Wells Fargo Bank, PNC Bank.
[8] At the time of its inception

I have served as a multi-term member on the board of directors of the Los Angeles Bankruptcy Forum and attended its educational meetings as well as attending meetings of other bankruptcy forums.

A copy of my Curriculum Vitae and an ACG Overview is attached hereto as Exhibit A and attached as Exhibit B is a list of cases in which I have testified.

## **DOCUMENTS**

In preparing this Report, I reviewed documents, publications and information (sometimes the "Documents") listed below:

- Complaint;
- Deposition Transcripts of John Cleary ("Cleary Depo");
- Flagstar's 2018 - 2020 Annual Reports;
- Flagstar Bank's Code of Conduct and Business Ethics;
- Experian's website;
- Equifax website;
- TransUnion website;
- Federal Trade Commission's ("FTC")website;
- Fair Isaac website;
- San Francisco Federal Reserve Bank's website;
- Office of the Comptroller of the Currency's ("OCC")website;
- OCC Manual, Retail Lending, (Retail Lending Manual");
- FDIC, Risk Management Manual of Examination Policies;
- Union Bank of California, Lender Liability Guidelines;
- Risk Management Association Code of Ethics;
- Consumer Financial Protection Bureau's ("CFPB") website;
- Consumer Financial Protection Bureau, Supervisory Bulletin No. 17, Winter 2017;;
- Fair Credit Reporting Manual, National Consumer Law Center ("NCLC");
- Mortgage Lending Manual, National Consumer Law Center;
- Truth in Lending Manual, National Consumer Law Center;

- Foreclosures and Mortgage Servicing Manual Including Loan Modifications,, National Consumer Law Center;
- The Cost of Credit Manual, National Consumer Law Center;
- Credit Scores and Credit Reports, Evan Hendricks;
- Economic/Hedonic Damages, The Practice Book for Plaintiffs and Defense Attorneys, Michael L, Brookshire, PhD and Stan V. Smith, PhD, 6th Printing ("Economic/Hedonic Damages");
- Analyzing Financial Statements, American Institute of Banking and American Bankers Association;
- You're Nothing But a Number, John R. Ulzheimer, Credit.com;
- Your Credit Score, Your Money & What's at Stake, How to Improve the 3-Digit That Shapes Your Financial Future, Liz Pulliam Weston, FT Press; and,
- Footnote and textual references.

During my banking, business, financial institution and consulting career, in addition to what I have learned from my professional work experience, I have attended numerous seminars, conferences and courses. I meet with business persons, executives, bankers, lenders, listen to television programs and read professional and trade publications including the American Banker, Wall Street Journal, Business Week, economic forecasts, CFPB Bulletins, Federal Reserve Bulletins and other news publications relating to business conditions, residential mortgage loan origination, loan servicing, force-placed insurance and interest rates. The subject matters covered by these materials include: banking, lending, litigation, loan servicing, residential mortgage loans, and economic forecasts. While the sources for these materials may vary, they are sponsored or published by various organizations closely associated with banking, business, consumer credit, commercial lending, economics, credit, corporate finance and real estate.

## **Credit Industry Standards**

Credit industry standards are found in many different places and from many different sources such as those referenced in the Documents section of this Report as well as from

regulatory agencies[9], banks and loan servicers, the credit reporting industry[10] and trade associations.

With respect to credit industry standards, throughout this Report, I have cited, as part of the basis for my opinions, various sources such as the CFPB; Flagstar's Code of Conduct and Business Ethics; National Consumer Law Center Manuals; Office of the Comptroller of the Currency, Risk Management Manual of Examination Policies and industry trade groups.  I have cited below a few relevant excerpts from those sources:

- **CFPB - Consumer Financial Protection Bureau, Supervisory Bulletin No. 17, Winter 2017:**

  - "Furnishers of information play a crucial role in the accuracy and integrity of consumer reports when they provide information to CRCs[11]. Inaccurate information from furnishers can lead to inaccurate reports and consequent harm to consumers and the market. For example, inaccurate information on a consumer report can affect a consumer's ability to obtain credit, housing, or employment. Moreover, furnishers have an important role in the dispute process when consumers dispute the accuracy of information on their consumer reports."  P.12.

  - "Inaccurate reporting undermines the central purpose of consumer reports, which is to predict, among other factors, the potential creditworthiness of consumers. Section 623(a)(1)(A) of the FCRA requires that a furnisher shall not furnish any information relating to a consumer to any CRC if the furnisher knows or has reasonable cause to believe that the information is inaccurate." P 17-18.

- **FDIC Risk Management Manual of Examination Policies:**  This is a manual used by bank examiners to evaluate banks.  In Section 4.2, p.  1 it states that "Internal controls include the policies and procedures that financial institutions establish to reduce risks and ensure they meet operating, reporting, and

---

[9]  For example: he Consumer Financial Protection Bureau, Federal Trade Commision, Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation
[10] Including Equifax, Experian and TransUnion (sometimes refered to as the "Big 3")
[11] Consumer Reporting Companies aka Credit Repirting Agencies ("CRAs")

compliance objectives. The board of directors is responsible for ensuring internal controls…. Internal control programs should be designed to ensure organizations operate effectively, safeguard assets, produce reliable financial records, and comply with applicable laws and regulations."

- **Comptroller of the Currency publishes handbooks and manuals.**   In its handbook, **Compliance Management**, it states that "A bank's overall compliance management system (CMS) includes policies, procedures, processes, monitoring and testing programs, and a compliance audit function regarding compliance with all applicable laws and regulations. The abbreviation "CMS" in this booklet refers to only those aspects of the bank's overall CMS that pertain to the bank's compliance with consumer protection-related laws and regulations. An effective CMS includes processes and practices designed to manage consumer compliance risk, support compliance with consumer protection-related laws and regulations, and prevent consumer harm."

- **Banking Industry:**   Union Bank of California provided Lender Liability Guidelines to its loan officers which included the need to perform all agreements in good faith, being honest, dealing fairly and professionally with borrowers and maintaining files and records in a professional manner.


### DISCUSSION, OBSERVATIONS AND OPINIONS

*In this Report, I may use terms such as actions, conduct, duty, fair dealing, honesty, good faith, lender liability, negligence, obligation, reckless, willfulness and other terms. In the context of this Report, I am not discussing, observing and/or opining from a legal perspective, but rather from a banking and business perspective regarding the use of such terms as they are commonly used in the ordinary course of business by banking, business and credit industry professionals.*

*Additionally, as discussed in this Report, I may use terms such as emotional, stress and other terms.  In the context of this Report, I am not rendering psychological and/or medical opinions and I do not intend to quantify emotional and/or medical opinions; but rather, I am only rendering my conclusions and opinions from a business*

*and direct personal experience perspective that is based upon meetings with hundreds of individuals involved in credit disputes and credit problems on a regular basis during the past 50-years.*

The observations, opinions and conclusions expressed in this Report are based upon my knowledge, education, experience, training and independent research developed throughout my more than 50-year career in the banking, business, board directorships, consulting and financial institutions industry as well as information that has been produced as part of the discovery process in this case.

**The Parties**

- **Ms. Oestreicher** is a consumer. She is 28 years old and lives in Brooklyn, New York.

- **Flagstar Bank, FSB** is a leading national servicer of mortgage loans and provides complementary ancillary offerings including MSR lending, servicing advance lending and MSR[12] recapture services."[13] In its 2020 annual Report (p. 4) Flagstar reported that: "We assisted more than 100,000 homeowners with forbearance relief on their mortgages and thousands of other customers and businesses with deferrals on their consumer or commercial loans."

New York Community Bancorp, Inc. is the parent company of Flagstar Bank, FSB, one of the largest regional banks in the country. The Company is headquartered in Hicksville, New York with regional headquarters in Troy, Michigan. At September 30, 2023, the NYCB had $111.2 billion of assets, $85.9 billion of loans, deposits of $82.7 billion, and total stockholders' equity of $11.0 billion.

Flagstar Bank, FSB operates 436 branches, including strong footholds in the Northeast and Midwest and exposure to high growth markets in the Southeast and West Coast. Flagstar Mortgage operates nationally through a wholesale network of approximately 3,000 third-party mortgage originators. In addition, the Bank has 134 private banking teams located in over 10 cities in the metropolitan New

---

[12] MSR is defined as Mortgage Servicing Rights

York City region and on the West Coast, which serve the needs of high net worth individuals and their businesses.

**Assumptions and Facts**

Summarized below are certain Assumptions and Facts pertinent to the observations and opinions expressed by me in this Report:

a. As a federally charted savings bank ("FSB"). Flagstar was well aware that it was "subject to the supervision of the CFPB, which regulates the offering and provision of consumer financial products or services under federal consumer financial laws…and the CFPB may take regulatory enforcement actions if we do not operate in accordance with applicable regulations, policies and directives."[14]

b. Flagstar was also well aware that risks with respect to the CARES Act " of wrongdoing in regards to laws, regulations, or applications of guidance could cause an adverse impact to our 18 financial results or our internal controls. We also may face an increased risk of client disputes, litigation and governmental as well as regulatory scrutiny as a result of the effects of COVID-19 on economic and market conditions."[15]

c. Flagstar 136 shows Ms. Oestreicher's Forbearance Application was completed on May 15, 2021

d. May 17, 2021, Flagstar letter[16] to Ms. Oestreicher - "SUBJECT: Please Contact Us about your Recently Missed Mortgage Payment" and inlcuced a Loss Mitigation Checklist and Application Homeowner[17]

e. May 18, 2021 Flagstar letter[18] to Ms. Oestreicher thanking her "for reaching out to us about the financial hardship you are facing as a result of COVID-19" and asking her to "submit a letter describing your financial hardship and any supporting documentation" that she may have.

f. May 24, 2021 hand written and signed letter[19] from Ms. Oesteicher regarding her inability to pay her mortgage due to COVID-19.

g. May, 2021, Ms. Oestreicher entered into a Forbearance Agreement[20] with Flagstar[21].

h. June 2, 2021 Flagstar letter[22], Dear Flagstar Customer(s) regarding "Available Loss Mitigation Options, one of which was a Forbearance Plan[23].

---

[13] Flagstar Bancorp 10K Report. Inc. for the fiscal year ended December 31, 2021, p. 5
[14] Flagstar Bancorp 10K Report. Inc. for the fiscal year ended December 31, 2021, p. 6
[15] Flagstar Bancorp 10K Report. Inc. for the fiscal year ended December 31, 2021, p. 18-19
[16] Flagstar00025-26
[17] Flagstar 00027
[18] Flagstar00042
[19] Flagstar00043
[20]
[21] Flagstar 00126
[22] Flagstar00044

i.   June 11, 2021 Flagstar letter[24] to Ms. Oestreicher "SUBJECT: Please Contact Us about Your Recently Missed Mortgage Payment"

j.   During Ms. Oestreicher's forbearance, Flagstar reported Ms. Oestreicher's trade line as having a late status.

k.   Flagstar 70 states: "Think of the forbearance as a "time out" to give you a chance to deal with your financial disruption, and work to replace your income or employment. If you can still make payments during forbearance you should, but **there will be no late fees or credit impact if you don't**.

l.   October 6, 2021 Ms. Oestreicher's letter[25] to Equifax disputing inaccurate Flagstar trade line reporting because of forbearance for the months June 2021-August 2021

m.   Flagstar00128 "Welcome back Faigy.  You are currently on an active forbearance that is set to end on 9/1/2021.

## Preface

My Report focuses on:

- Flagstar's practices in relation to COVID-19 non-government mortgage payment credit reporting industry standards pertaining to delinquent payment trade line credit reporting during forbearance agreements.

- It also involves Flagstar's claim that "Our relationship-based business model leverages our full-service bank's capabilities and our bational mortgage platform to create and build solutions for our customers"[26] and its compliance with the banking and credit reporting industry standards of:

  i.   maximum possible accuracy;

  ii.  compliance with guidelines, laws and regulations;

  iii. fair dealing, good faith, honesty; and,

  iv.  having quality control detection and purging systems in place to handle consumer disputes pertaining to inaccurate and outdated information.

## The Circumstances and Climate for Loan Modification and Forbearance Agreements has Changed

---

[23] Flagstar00045
[24] Flagstar00051
[25] Flagstar00127
[26] Flagstar Bancorp. 2020 10K Report, p 6

Since the mortgage industry collapse in 2008 and the ensuing recession (2008-2010) and national foreclosure crisis the dynamics for modifying mortgages for low and moderate income homeowners has changed substantially.  In response to the foreclosure crisis and its economic and societal impact, mortgage lenders and servicers became more sensitive to the benefits of loan modifications and their willingness to liberalize their guidelines by proactively engaging in foreclosure prevention programs.  Mortgage lenders and servicers.  With government pressure, the credit philosophy of strict mortgage payment collection evolved into the realization that it did not make sense.  This led the industry to develop foreclosure alternative solutions such as forbearance agreements to assist homeowners to bridge periods of economic and personal hardship.

## **Mortgage Forbearance**

Mortgage forbearance is defined by the CFPB as:

> "A process that can help if you're struggling to pay your mortgage. Your servicer or lender arranges for you to temporarily pause mortgage payments or make smaller payments. You still owe the full amount, and you pay back the difference later. Forbearance can help you deal with a financial hardship.[27]"

The Truth-in-Lending Act ("TILA") provides guidance pertaining to "material disclosures" which according to the National Consumer Law Center[28] is:

> "TILA's core purpose is to provide "meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit.  .

> "Meaningful disclosure means accurate and intelligible disclosure[29]…. The standard is an objective one that of the ordinary consumer…. Meaningful disclosure focuses on conveying the critical information clearly to consumers."

> Additionally, the Regulation Z standard requires that the disclosure must be "clear and conspicuous..

---

[27] Google search: CFPB: What is mortgage forbearance? October 19, 2023
[28] Truth in Lending Manual, 4.2.4
[29] In re Cox, 114 B.R. 165   (Bamke. C.D. Ill. 1990) ("a meaningful disclosure be one which is inaccurate,")

The CFPB provided guidance on how to report mortgage forbearances with respect to the CARES ACT. It is my opinion that its guidance has became the industry standard for all forbearances and it prohibits the type of delinquent payment reporting that occurred here. For example in response to Frequently Asked Questions the CFPB reported on February 23, 2022:

> "QUESTION 2: If a furnisher provides a consumer an accommodation, what are its consumer reporting obligations? ANSWER (UPDATED 6/16/2020): Section 4021 of the CARES Act amends the FCRA to address how furnishers report accounts subject to an accommodation. For more information on what constitutes an accommodation for purposes of the CARES Act, see FAQ #1 above. As noted in FAQ #1, furnishers can grant accommodations voluntarily or pursuant to a statutory or regulatory requirement. The CARES Act provisions addressing how furnishers report accounts subject to an accommodation apply if: (1) a furnisher makes an accommodation with respect to one or more payments on a credit obligation or account of a consumer, and (2) the consumer makes the payments or is not required to make one or more payments pursuant to the accommodation. If the credit obligation or account was current before the accommodation, during the accommodation the furnisher must continue to report the credit obligation or account as current. If the credit obligation or account was delinquent before the accommodation, during the accommodation the furnisher cannot advance the delinquent status. For example, if at the time of the accommodation the furnisher was reporting the consumer as 30 days past due, during the accommodation the furnisher may not report the account as 60 days past due. If during the accommodation the consumer brings the credit obligation or account current, the furnisher must report the credit obligation or account as current. This could occur, for example, if the accommodation itself brings the credit obligation or account current (such as a loan modification that resolves amounts past due so the borrower is no longer considered delinquent) or if the consumer makes past due payments that bring the credit obligation or account current. These CARES Act provisions addressing how furnishers report accounts with an accommodation do not apply with respect to credit obligations or accounts that creditors have charged off. For additional requirements regarding payment suspensions and furnishing information about Federally held student loans, see section 3513 of the CARES Act."

With respect to credit reporting and the negative effects on a consumer's credit the CFPB has also reported that the downside of mortgage forbearance is that:

> "unless your loan servicer specifies otherwise, they will report your mortgage forbearance to the credit bureaus, which can **lower your credit**

score because it shows a period when you weren't making mortgage payments."[30]

### **FCRA, Credit Reporting and Compliance Risk**

### **FCRA and Consumer Disputes**

The FCRA is designed to permit consumers to dispute inaccurate credit information and have it promptly corrected. This is especially so where the consumer has made credit reporting disputes, both directly to the furnisher and through CRAs.

This is not your garden variety credit reporting inaccuracy case. It is a case of Flagstar's failure to comply with the important credit standard for the "clear and conspicuous disclosure"" of what a creditor will do if a consumer enters into a Forbearance Agreement.

The facts in this case are particularly telling. Flagstar informed Ms. Oestreicher that if she entered into a Forbearance Agreement that she would be afforded protection from negative trade line reporting during the forbearance period (June, July and August 2021)..

### **Herculean Efforts Should Not Be Required By Consumers**

Consumers should not be expected to undertake Herculean efforts (such as disputing inaccurate, negative trade line mortgage payment information and having to file a lawsuit) to remove errors contained in their credit reports. The FCRA and the industry standards of maximum possible accuracy and commercially reasonable credit mortgage payment reporting during forbearance. However, here Flagstar, based on the information produced during discovery, did not comply with standards and/or comply with the FCRA and TILA.

---

[30] Google search: CFPB: What is the downside of mortgage forbearance? October 27, 2023

**Special FCRA Procedures**

The FCRA provides procedures for difficult or recurring credit reporting problems which Flagstar did not utilize for the benefit of consumers, like Ms. Oestreicher, such as in:

- 15 USC § 1681e (b) requires credit reporting agencies to develop reasonable procedures to ensure maximum possible accuracy. A failure to maintain reasonable procedures will result in liability.

- 15 U.S.C. Section 1681s-2 (a) (1) obligates a furnisher, such as Flagstar, not to furnish information to a consumer reporting agency if it knows that the information is inaccurate.

- 15 U.S.C. Section 1681s-2 (b) (1) (D) obligated Flagstar, upon learning that the reporting was inaccurate, to notify all other consumer reporting agencies.

- 15 U.S.C. Section 1681s-2 (b) (1) (E) obligated Flagstar, to "modify that item of information" or "permanently block the reporting of that item of information" if it is found to be "inaccurate or incomplete or cannot be verified."

- Section 1681s-2 (b) (2) obligated Flagstar to do this *within 30 days,* or certainly as soon as it became apparent that the account could not be verified as belonging to Ms. Oestreicher.

Based on Ms. Oestreicher's hand written letter dated May supplied to Flagstar pertaining to her hardship being caused by Covid-19, I have concluded that Flagstar contention that it didn't get her hardship letter until late August to be inconsistent with documents produced by Flagstar (Flagstar00043) and not credible.

Further, it is my opinion that Flagstar breached and violated mortgage industry standards, its own policies and procedures and its public policy standards by reporting Ms. Oestreicher's mortgage payments as delinquent for June, July and August 2021.

## FCRA Compliance Departments are not a Profit Center

It has been my experience that FCRA compliance departments are not a profit center. They do not generate revenue or income for most banks. On the contrary, there is no profit to be generated from correcting inaccurate credit reports. However, this is no excuse for not attending to FCRA compliance and investing in better audit procedures, personnel training and technology to prevent future inaccurate, incomplete, and outdated information from being furnished to and/or verified to CRAs. In its 2018 Annual Report Flagstar states the following relative to Compliance Risk:

- "Compliance risk is the risk of legal or regulatory sanctions, material financial loss or damage to the reputation of the Corporation arising from the failure of the Corporation to comply with the requirements of applicable laws, rules and regulations and our internal policies and procedures." P 91.

- "The [Board] Audit Committee is also responsible for overseeing compliance risk pursuant to the New York Stock Exchange listing standards." P 56.

## National Consumer Law Center Commentary

According to the National Consumer Law Center's (sometimes the "NCLC"[31]) treatise[32]:

"The FCRA defines a consumer report as bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living. Since a report need bear on only one of these seven factors, virtually any information about a consumer satisfies this part of the definition of a consumer report…."[33]

---

[31] The NCLC is an American non-profit corporation that publishes books and manuals pertaining to consumer laws and issues. Staff members frequently testify before Congress on issues such as ID theft, FCRA, FDCPA, mortgage and other issues.
[32] Fair Credit Reporting Act Manual, Fourth Edition (sometimes "FCRA Manual").
[33] FCRA Manual, p. 44.

### Flagstar is a Gatekeeper

I am also mindful that as a furnisher of credit information that Flagstar serves as a gatekeeper. Illustrative of the importance of information reported by CRAs, is the following excerpt from Mr. Ulzheimer's book, "You're Nothing but a Number, Why achieving great credit scores should be on your list of wealth building strategies":

> **"Whatever your reason, it really doesn't matter. What matters is that you should care and you should care a lot. You simply cannot avoid the influence of credit reporting and credit scoring. No matter how hard you try, you're in the system and will be in the system until you die. Remember what I said in the introduction. The most powerful companies in America are the ones that preside over your life by maintaining your credit."** p. 16-17.[Emphasis added]

Consequently, it is my opinion that it was commercially reasonable for Flagstar to be aware that any inaccurate delinquent payment trade line information furnished and/or reported could damage a consumer, like Ms. Oestreicher and others who may be similarly situated.

It has been my direct experience that consumers, like Ms. Oestreicher and/or others who may be similarly situated, rely upon accurate credit information (being provided by credit furnishers and reporters), and that furnishing/verifying inaccurate delinquent payment and/or outdated information is not consistent with any bank, CRA and/or credit industry standards.

Clearly the industry standard for "maximum possible accuracy" requires quality control programs to detect inaccurate delinquent payment and outdated reporting of consumer file data, and adequate procedures for investigation disputed information to be sure that only accurate information is "verified." Internal controls and systems designed to assure the accuracy of consumer information being furnished are important and consistent with regulatory guidelines and credit industry standards.

It is my opinion, with respect to Ms. Oestereicher, that while Flagstar has policies and procedures, its conduct and actions did not meet industry standards and were "in reckless disregard" of Ms. Oestreicher's rights which are contained in the FCRA and

which are established credit industry standards[34]. This is because here, Flagstar's actions go far beyond careless and negligent account monitoring and compliance practices. After all, Flagstar had direct information concerning Ms. Oestricher's entrance into a COVID-19 forbearance [PL 126] and even received a May 24, 2021 hand written COVID-19 hardship letter [FL00043]) in its files concerning information pertaining Ms. Oestreicher's Forbearance Agreement which included a mutually agreed payment suspension period. Therefore, Ms. Oestreicher was current on her contractual payments in June, July and August 2021 and consequently, there was no delinquency.

## Credit Administration

Financial service industry credit administration functions include accounting and recording, customer service, statement preparation, credit reporting and dispute resolution. Here, since no payments were due during the forbearance those functions were compromised by furnishing inaccurate information to CRAs. Not timely correcting and "verifying" false, inaccurate negative outdated credit information is not good customer service. Failing to correct mistakes and resolve disputes is also a violation of industry standards. This logical because it is only through investigation that mistakes can be detected so that maximum possible accuracy can be achieved.

The conclusion, I have drawn from my experience, training, education and the Documents I have reviewed is that Flagstar failed to comply with the FCRA and violated industry custom, standards and practices relative to Ms. Oestreicher which directly led to inaccurate, negative delinquent payment trade line information regarding Ms. Oestreicher.

Here, credit industry standards required Flagstar to be FCRA compliant[35] and to have effective policies and internal controls governing each operational area such as credit reporting, customer inquiry responses, dispute resolution, investigation and re-investigation, debt validity and customer service. Effective policies and strong internal controls enable financial institutions and service companies, like Flagstar to adhere to established and effective risk management practices that are in the public interest. The

---

[34] Union Bank of California, Lender Liability Guidelines which include good faith, honesty, fair dealing and the retention of important records.
[35] For example: The Federal Examiner's Risk Management Guide requires compliance with all laws and regulations.

conclusion I have drawn from my analysis, is that Flagstar did not have in effect adequate enforced and established internal policies and procedures. Therefore, either way, Flagstar was in violation of credit industry practices, regulatory guidelines and standards, as well as the FCRA.

### Importance of Credit and Accurate Credit Reporting

The Federal Reserve Bank of San Francisco has reported:

> **Credit is valuable**. The amount of how much credit you have and how much you use it goes far beyond shopping. Whether you have good or poor credit can affect where you live and even where you work, because your credit record may be considered by prospective employers. That is why you need to understand how credit is awarded or denied and what you can do if you are treated unfairly."[36]

Here, during the forbearance Ms. Oestreicher was not required to make payments. However, contrary to the terms of her Flagstar Forbearance Agreement and Flagstar's representations, Flagstar credit reported Ms. Oestreicher's mortgage trade line status as late and more than 30 days delinquent. As a result, Ms. Oestreicher's Flagstar mortgage trade line was inaccurately reported to CRAs which affected her credit score and the perception of her credit worthiness. Once a COVID forbearance was entered into, as seen at PL 126, it was inaccurate to report Ms. Oestreicher as late during this time. Even further, at a minimum, the reporting during these months should have reported that a forbearance was entered into. The omission of this information creates a wholly inaccurate and misleading perception as to Ms. Oestreicher's creditworthiness.

### Flagstar's Corporate Governance

"Corporate governance is the system by which companies are directed and controlled. It involves regulatory and market mechanisms, and the roles and relationships between a company's management, its board, its shareholders and other stakeholders, and the goals for which the corporation is governed. In contemporary business corporations,

the main external stakeholder groups are shareholders, debtholders, trade creditors, suppliers, customers and communities affected by the corporation's activities. Internal stakeholders are the board of directors, executives, and other employees…. An important theme of corporate governance is the nature and extent of accountability of people in the business."[37]

Here, it is my opinion that Flagstar:

- Did not comply with the public policy statements contained on its website or in its 2018 Annual report[38];
- Did not comply with its Code of Conduct;
- Did not acknowledge it was accountable for the harm and damage it caused Ms. Oestreicher;
- Did not timely resolve Ms. Oestreicher's inaccurate delinquent trade line account;
- Did not comply with credit industry standards;
- Did not comply with the FCRA; and
- Engaged in Jekyll and Hyde behavior by projecting one image to the public[39] and by acting totally different with respect to Ms. Oestreicher's dispute.

## **Flagstar's Business Culture**

"Business culture" is a term that is widely used in the financial service industry to describe how a business conducts itself, projects its public image as well as the types of risks it is willing to accept and how it intends to govern itself. A conclusion drawn by me is that Flagstar's business culture embraced an inherently flawed Forbearance Agreement delinquent payment credit reporting methodology for payments made during a forbearance that:.

---

[36] Federal Reserve Bank of San Francisco, Consumer Information, Your Credit Life How the Law Protects You.

[37] Definition, Wikipedia.

[38] Flagstar reported in its 2018 10K Report its strategy and "Our mission is to build and leverage a diverse, inclusive, and engaged workforce that inspires all individuals to work together toward a common goal of superior business results by embracing the unique needs and objectives of our customers and community."

[39] Id. In my opinion even though Ms. Oestreicher reached out to Flagstar through the ACDV process, it took a lawsuit to get inaccurate information purged.

- Was not consistent with its public policy statements and/or its code of conduct.

- Did not have "safe and sound" credit dispute investigation practices or  proper internal controls and systems in place to monitor and make sure that:

> (i) inaccurate delinquent payment information could be properly and timely detected and removed from a consumer's accounts;

> (ii) correct information furnished to CRAs such as date of delinquency and payment status;

> (iii) commercially reasonable investigations are conducted regarding disputed credit information furnished to CRAs.

I am mindful that words[40] matter and impact the public in part through advertisements, annual reports and in codes of conduct.  The power of words is illustrated by the following quotation made by Meg Whitman, former E-Bay and Hewlitt Packard CEO, who said: "Say what you mean and do what you say."

It has been my direct experience that the Codes of Conduct of large banks, like Wells Fargo, JPMorganChase, and US Bank, are remarkably similar  to Flagstar's.  Codes set expectations pertaining to a course of conduct, such as credit reporting that requires conformity to laws and regulations and are available for public review with a simple Google search – "Flagstar Bank's Code of Conduct"[41]..

I have always been taught that if something is wrong; you should try to fix it: and not ignore it.  Here, there were clear inaccuracies contained in Ms. Oestreicher's credit file that needed to be either purged or corrected .An issue in this case is the reasonableness of the investigations performed by Flagstar following notification from CRAs. Here, based on information contained in its own files, Flagstar ignored the industry guidance and provided incomplete information to the credit agencies.   Multiple ACDV forms were received and processed by Flagstar, yet each time it "verified" obviously incorrect information such as payment status and payment history and did not

---

[40] Oral and/or written

[41] According to Flagstar : "Our code of Ethics …We expect all our employees to conduct themselves in an ethical way in all situations. Our employees receive regular training to uphold the following behaviors: Provide banking that strives to be personal, private, and secure for our customers. Do the right thing.

provide the full context that during those months in 2021, the loan was in forbearance. As of the date of Ms. Oestreicher's Forbearance Agreement, Flagstar should have reported:

- payment status,
- payment history during forbearance

It is the standard in the banking and credit reporting industries to act fairly, in good faith, honestly and reasonably[42]. The continued inaccurate negative reporting and failure to delete outdated information by FLAGSTAR violated those standards. And, in my opinion, were also "bad faith" conduct that led to foreseeable to damage and harm to Ms. Oestreicher.

Here, based upon my knowledge, experience and my review of the facts and circumstances of this case, although Flagstar has written polices and procedure it did not have in place established and enforced the necessary COVID-19 or records retention policies and practices to properly address and timely resolve Ms. Oestreicher's disputes of inaccurate delinquent payment credit information. This is a case where "the proof is in the pudding."

In my opinion, Flagstar's actions and conduct represent a willful course of conduct and  an inherent attitude that credit reporting consistent with the industry standard of maximum possible accuracy is not important enough to invest the time, resources and energy to make sure it gets done correctly. This includes making sure that it does not occur in the first place; and if it did that a thorough investigation should be undertaken to insure quality control protocols so that timely corrections actually take place.


**Observations Regarding Willfulness of Flagstar's Actions and Conduct**

Initially, I note that major banks and CRAs often deny liability and procrastinate over a protracted period of time by alleging they followed their policies; and, as a result, they conclude that there was no willfulness on their part. I have often found such conclusions are specious at best as well as being illustrative of bad faith and dishonesty. In the credit reporting arena, few consumers have enough knowledge to know whether or not a

---

[42] Union Bank of California, Lender Liability Guidelines.

defendant has acted willfully and I have observed how the credit bureaus and major banks make it a habit not to let consumers or the public know the internal details of how they handle credit reporting issues.

**Intent**

Based on my experience, I have found that when evaluating willfulness in a credit reporting context, one has to keep in mind that the FCRA is specifically designed to prevent false, inaccurate, outdated or unverifiable information in credit reports. within 30 to 45 days. Even when obvious errors exist and/or mistakes are committed by the furnishers or by the credit bureaus, the industry standard would still be for furnishers and CRAs to have quality control systems and procedures to review information relative to all consumers to permanently correct credit reports.  Here, in stark contrast, the information concerning Ms. Oestreicher was inaccurate and had to continue to be re-disputed because Flagstar failed to correct the derogatory information.

Based on my experience and training, credit report furnishers, which are reasonably diligent about FCRA compliance, have systems in place which detect and delete inaccurate credit reporting.   And, if the false credit reporting is not corrected within that time period, then there are higher-level, more thorough procedures applied and/or developed in coordination with other departments (such as IT and Compliance Management specialists) to correct the problem.  Here, based upon my review of the circumstances and the facts, Flagstar did not apply the necessary higher-level credit correction steps to fully resolve Ms. Oestreicher's delinquent payment credit reporting difficulties.

A further inference I have drawn is that Flagstar's ACDV response investigation department is not a profit center even though in its corporate code Flagstar discusses employee responsibility and accountability[43], Flagstar did not have in place established and enforced systems and procedures to detect Ms. Oestreicher's delinquent payment

---

[43] FLAGSTAR's Values:  FLAGSTAR has an extensive Code of Conduct that os availkable on the internet. In addition, its CEO Brian Moynihan states in the 2019 Code that "our code of conduct: our foundation for success."  Here, there was an obvious problem that needed to be fixed but it wasn't.

information.  However, it is callous and totally irresponsible to ignore credit reporting errors because harmful credit reporting practices has significant adverse effects and, in my opinion, Flagstar had a responsibility to promptly and timely correct inaccurate delinquent payment trade line reporting; but it didn't.

<u>**Credit Damage Overview**</u>

According to many of my credit industry peers, damages created by inaccurate negative trade line credit information may cause a large variety of adverse consequences for consumers (such as Ms. Oestreicher and others similarly situated) that may include: higher borrowing costs on loans and credit cards, reduced credit availability, emotional distress and loss of enjoyment of life.

Consequently, it is my opinion that (i) Flagstar's's failure to act consistent with the credit industry standards to conduct thorough investigations/re-investigations which includes an examination of its own records to insure maximum possible accuracy; and (ii) the inaccurate, negative delinquent payment related trade line credit information furnished by Flagstar's to CRAs who then reported it to others, with a high degree of commercial certainty, damaged Ms. Oestreicher and, likewise others who may be similarly situated.  This is wholly consistent with both Ms. Oestreicher's testimony and the denial she received dated April 5, 2022 [PL 0001]. The Flagstar reporting's effect can be demonstrated by reviewing each of the first three reason codes within the denial. The first code, serious delinquency, is triggered by Flagstar's 90 day late reporting. The second code, number of accounts with delinquency, is also triggered in part because of the Flagstar reporting.  The third code, recency of delinquency, is also directly contributed to by Flagstars reporting.  Accordingly, it is my opinion, that the Flagstar reporting played a significant factor in Ms. Oestreicher's denial.

<u>**Good Credit is Important and Benefits Consumers**</u>

Good credit and the absence of negative trade line information is important and is reflected by the following:

**Federal Reserve Bank of San Francisco** has reported:

"Credit is valuable.  The amount of how much credit you have and how much you use it goes far beyond shopping.  Whether you have good or poor credit can effect

where you live and even where you work, because your credit record may be considered by prospective employers.  That is why you need to understand how credit is awarded or denied and what you can do if you are treated unfairly."[44]

**TransUnion** states the following:

"The Federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness and privacy of information in the files of consumer reporting agencies."

"You make seek damage from violators.  If a consumer reporting agency, or, in some cases a user of consumer reports or a furnisher of information to a consumer reporting agency violates FCRA you may be able to sue in State or Federal Court."[45]

## Credit Expectancy is Adversely Impacted by Negative Credit Information

It has been my direct experience that a major result of credit damage is often the loss or reduction in credit expectancy (credit availability).  In fact, in a recent TV ad, Experian reported that 90% of all credit decisions are based on credit information and credit scores. Based upon my experience, I have found this to be true and I agree.

## Credit Scoring

Credit score computations are heavily weighted to take into account payment histories and delinquent account information furnished to them, and data contained in public records, as illustrated below:

**Factor 1: Payment History (35%)**
- Track record with various lenders
- Length of Positive Credit History
- Length of Time that has Passed Since the Most Recent Negative Item
- Severe Unpaid Debts – Public Records
- Severity & Quantity of Delinquencies

**Factor 2: Amount Owed – Extent of Indebtedness (30%)**
- Quantity of Credit Accounts
- Ratio of Credit Balance to Credit Limit
- The amount owed on all accounts

---

[44] Federal Reserve Bank of San Francisco, Consumer Information, Your Credit Life How the Law Protects You.
[45] TransUnion, A Summary of Your Rights Under the Fair Credit Reporting Act.

- How Much is Owed On Each Type of Account?
- How Much of Mortgage or Other Installment Loans Are Paid Off?

**Factor 3: Length of Credit History (15%)**
- Overall Length of Credit History (In General)
- How long have specific credit accounts been established?
- How long has it been since you used certain accounts?

**Factor 4: How Much New Credit Are You Assuming? (10%)**
- How many new accounts, particularly credit card accounts?
- How long has it been since you opened a new account?
- How many recent requests for credit have you made, as indicated by inquiries to the credit bureaus?
- Length of time since credit report inquiries were made by lenders
- Whether you have a good recent credit history, following past payment problems

**Factor 5: Inquiries (10%)**

As a consumer's credit profile gets stronger over time with no negative information, consumers become a better credit risk candidate for credit providers. Therefore, the credit grantor asks for less interest or down payment as compensation for letting the consumer use credit to pay for services and/or to use its money to extend loans for credit cards, cars and mortgages. Here, Ms. Oestreicher's ability to obtain credit was adversely impacted by reporting her payments as delinquent and interjecting inaccurte, negative delinquent payment trade line information, thereby creating a false and slanderous credit profile.

<u>**Flagstar's 2020 Net Income and Shareholder's Equity**</u>

| | |
|---|---|
| **Net Income/Profit** | $  538M |
| **Shareholder Equity** | $2,201M |

**Questions and Answers on Areas of Inquiry:**

- How should Flagstar have reported Ms. Oestreicher's trade line during her forbearance? Account Payment History for June, July and August as Current.

- Were Flagstar's investigations of Ms. Oestreicher's inaccurate delinquent payment trade line disputes reasonable? No.

- Was Flagstar's investigation of Ms. Oestreicher's delinquent payment trade line dispute regarding consistent with industry standards?   No.

- Were Flagstar's actions and conduct pertaining to furnishing Ms. Oestreicher's trade line  account  information to CRAs consistent with industry standards?   No.

- Were Flagstar's actions and conduct regarding correcting, deleting, blocking or suppressing the delinquent payment trade line consistent with industry standards? No.

- Did Flagstar's failure to timely delete and purge inaccurate delinquent payment trade line  credit information impact Ms. Oestreicher's credit score and credit worthiness?  Yes.

- Did Flagstar's reporting to the credit agencies contain material omissions by failing to indicate that Ms. Oestreicher was in Covid forbearance during June, July and August 2021? Yes.

**Supplemental Information:**

Pursuant to Federal Rule of Civil Procedure 26:  Disclosure of expert testimony, the following is submitted:

1.  Expert Witness:
    Thomas A. Tarter
    Managing Director
    The Andela Consulting Group, Inc.
    18783 Tribune Street
    Northridge, CA 91326
    818 -488-9101
    Please refer to Exhibit A for my CV and an Andela Overview

2.  Statement of all opinions to be expressed and the basis and reasons therefore:
    Please refer to this Report.

3.  Facts and Data considered by the expert witness in formulating his opinions:
    Please refer to this Report and the Documents section.

4.  Exhibits that Will Be Used to Summarize or Support Opinions:
    Please refer to the Documents section in this Report

5.  Qualifications, including Publications in the past 10 years:
    Please refer to the Qualifications section in this Report and Exhibit A.  I have no publications in the past 10 years

6.  List of cases this expert witness has testified at trial, deposition, mediation or arbitration:
    Please refer to Exhibit B.

7.  Compensation:
    $295.00 per hour for litigation consulting, report preparation and travel time.
    $495.00 per hour for testimony at deposition or trial with no contingencies..

**Attached documents include:**

**Exhibit A - CV and Andela Overview;**
**Exhibit B - Case Log – arbitration, depo, mediation and trial**

# EXHIBIT A

**Andela and Tarter Background Information:**

**See Attached:**
**Andela Overview**
**Thomas Tarter's Resume**
**Addendum to Thomas Tarter's Resume**

# The Andela Consulting Group, Inc.
**18783 Tribune Street**
**Northridge, CA 91326**

**Thomas A. Tarter, Managing Director**        **Telephone:(818) 414-6685**
**Expert Witness - Banking**
**Consulting - Financial and Management**        **E-Mail: ttarter@earthlink.net**
                                                **Website:andelaconsulting.com**

The Andela Consulting Group, Inc. ("Andela Consulting"), managed by Thomas A. Tarter, engages in banking, credit (commercial and consumer) and credit damage Expert Witness/Litigation Support.  Andela Consulting has provided business reorganization, management and financial advice to financial institutions and businesses.  With more than 50-years of experience as a banker, business owner, a consultant and financial advisor, Mr. Tarter brings to Andela Consulting's clients extensive knowledge on how businesses, banks, creditors and financial service companies operate.

Andela Consulting has been involved in many matters which include: retention by regulatory agencies, financial institution reorganization, banking, class actions, court approved independent directorships, financial advisor, cash controls and management, checking accounts, electronic funds transfer, consumer credit, credit cards, car financing, debt collection, embezzlements, FCRA, FDCPA, TILA, RESPA, loan origination, loan mods, foreclosures and repos, credit damages, Ponzi schemes, consumer and commercial real estate lending, including land acquisition and development, bankruptcy plan interest rate and plan feasibility analysis, development and construction loans, corporate lending, corporate governance, loan servicing, lender liability, letters of credit, loan commitments, bank and guaranty demands, loan transactions, shareholder and insider matters, internal audit, banking Regulations and compliance matters.

Andela Consulting was formed in 1993 and since that time it has worked with many types of clients in a variety of areas.  These include: (i) Sunshine Makers, Inc. d/b/a Simple Green to serve as an independent director; (ii) Marin Outdoor, appointed as a director in connection with its financial restructuring and Chapter 11 proceedings;  (iii) Numerous class action case fairness opinions pertaining to class member Settlement Agreement benefits (monetary and non-monetary) for borrowers; (iv) A California Bank to provide litigation consultation regarding lending industry customs, standards and practices involving loan commitments; (v) Retained by the FDIC as receiver in multiple cases involving appraisal, construction lending, guaranty, loan origination and underwriting issues; (vi) Numerous cases involving mortgage loan servicing; (vii) Consumer credit - TILA, loan and lease transactions, credit damages; (viii) Fifth Third Bank Overdraft "high to low sorting" litigation; (ix) Numerous Loan Modification cases; (x) Numerous Class Action cases involving Loan Servicing issues; (xi) Auto financing and leasing; (xii) A Viatical Service Company to provide expert testimony and litigation consultation regarding asset-based lending industry customs, standards and practices and lender liability issues; (xiii) A Financial Institution to provide expert testimony and litigation consultation regarding real estate loan restructuring, construction and permanent lending; (xiv) Credit damage analyses – consumer credit arising from debt collection, loan servicing, credit reporting errors; (xv) Developed a cash management and control system for multiple inter-related Chapter 11 debtors operating in several states including Hawaii; (xvi) Developed court approved business rehabilitation and marketing plans for a troubled bank; (xvii) Appointed to the board of directors

of First Alliance Mortgage Company, as an independent, outside director, after the company filed for bankruptcy protection; (xvii) Numerous bankruptcy plan related interest rate computations and plan feasibility analyses; (xviii)) Numerous cases involving embezzlement, forgery and endorsement issues; and (xx) Oswell Self Storage to provide turnaround management and advisory services to a Chapter 11 debtor.

# THOMAS A. TARTER
## CURRICULUM VITAE
**The Andela Consulting Group, Inc.**
**18783 Tribune Street**
**Northridge, CA 91326**
Telephone: (818) 414-6685
E-Mail: ttarter@earthlink.net

## EDUCATION:

University of California at Los Angeles, Bachelor of Science degree in Business, 1965.

University of Santa Clara, Master of Business Administration degree with a specialization in Finance, 1969.

## LECTURER:

Mr. Tarter has been an expert, instructor, panelist and/or guest lecturer for several professional organizations and institutions of higher education, including the following:

> American Institute of Banking
> American Management Association
> Los Angeles City College
> United States Small Business Administration
> Gonzaga University School of Law
> University of San Diego School of Law
> Practicing Law Institute
> National Association of Consumer Advocates
> International Institute of Business and Banking
> Orange County Bankruptcy Forum
> Los Angeles Chapter of the American Society of Appraisers
> Southern California Chapter of the Appraisal Institute

## PROFESSIONAL EXPERIENCE:

September 1993 – Present
**The Andela Consulting Group, Inc.**, Managing Director
Provides expert witness, management, financial, and advisory services involving corporate governance, commercial and consumer credit, credit damages, credit cards, deposit accounts, management, court approved directorships, court approved financial advisor and financial institution matters.

Mr. Tarter has served on boards, assisted in corporate restructures, and has provided advisory services to a diverse group of clients including consumers, corporations, law firms, banks, financial institutions and governmental agencies, including the FDIC, as Receiver.

Thomas A. Tarter CV

Page 2

October 1985 – August 1993

**First Los Angeles Bank,** Executive Vice President, Member of Officers Loan Committee

During his association with First Los Angeles Bank, Mr. Tarter was responsible for supervising the bank's largest banking region and was involved in developing compensation and incentive programs, asset/liability management, development of policies and procedures (deposit, operations and credit) and strategic planning. Additional responsibilities included marketing, public relations, mergers, acquisitions, the development of non-traditional banking businesses, such as a mortgage banking division and an SBA loan department.

November 1984 – September 1985

**Center National Bank**, Director, President and Chief Executive Officer

Recruited to administer a troubled financial institution. Developed programs to implement regulatory requirements and to constrict the bank's assets to adhere to capital constraints. Developed and implemented policies and procedures involving credit administration, operations, risk management and personnel including compensation, termination, staff curtailment and recruitment.

January 1980 – October 1984

**Bank of Los Angeles**, Organizer, Founding Director, President and Chief Executive Officer

Responsible for organization and completion of two stock offerings, initial (1982) and secondary (1984), both of which were over-subscribed. Responsible for the initial and ongoing organization of the bank, as well as supervising its operations and growth. Negotiated the acquisition of the American City Bank - Beverly Hills from the Federal Deposit Insurance Corporation. Developed and implemented policies and procedures including compensation, personnel, credit and audit.

1977 – 1980

**First Los Angeles Bank**, Regional Vice President and member of the bank's Officers Loan Committee

1976 – 1977

**Sanwa Bank of California**, Vice President and Senior Credit Officer for Southern California and Member of Loan Committee.

Responsible for administering the bank's loan portfolio in Southern California, including the implementation of policies, procedures and controls to monitor the bank's corporate, real estate, consumer loan activities and its operations risk management systems.

Thomas A. Tarter CV

Page 3

1969 – 1975

**Lloyds Bank California**, Vice President, Corporate and California Divisions

Responsible  for the administration and development of major corporate relationships. Developed  new lending programs including acceptance and SBA financing.

Additionally, Mr. Tarter was a founding organizer of Hancock Savings Bank.  He shared responsibility for its formation, organization and co-organized its initial stock offering.

**TESTIMONY**:

Mr. Tarter has provided expert testimony at deposition and trial in municipal, state and federal courts as well as at arbitration.

Litigation and consultation clients included: Bank of the West, Mobil Oil Corporation, Ford Motor Credit Corporation, CNA, Credit First Bank, Republic Bank, Sanwa Bank, Citicorp, Deutsche Bank, CUMIS, GEICO, State Farm, FDIC as Receiver, Harvard University, JPMorgan Chase, Gonzaga University, University of California at Irvine, Wells Fargo Bank, Union Bank of California, Washington Mutual, Bank of Saipan, United Mortgage, Small Business Administration, as well as individuals, municipalities, partnerships and businesses.

**BOARD MEMBERSHIPS AND BUSINESS AFFILIATIONS INCLUDED**:

Western States Bankcard Association
Sunshine Makers, Inc. d/b/a Simple Green
Fort Ord Credit Union
Holiday World RV
Marin Outdoor (Bankruptcy related directorship)
First Alliance Mortgage Company (Appointed director during bankruptcy proceedings)
American Standard Development Company, Inc.
BKLA Bancorp
Center Financial
Los Angeles Bankruptcy Forum (multi term)
Los Angeles Business Council, member of Executive Committee
Loyola Marymount University, Fine Arts/Film School Council

**MEDIATOR**:

Mr. Tarter appointed by the United States Bankruptcy Court – Central District of California to its panel of mediators (1995 - present).

**Addendum to CV of Thomas A. Tarter**

Qualifications: My background involves experience with large and small banks. Lloyds Bank California, Sanwa Bank of California and First Los Angeles Bank were subsidiaries of very large, international banks. At Sanwa Bank and First Los Angeles Bank, I was involved in evaluating potential acquisitions that involved "healthy" and "distressed" banks. At First Los Angeles Bank, I was also involved in the purchase of loans from the F.D.I.C. and the sale of non-performing loans.

I was also involved in the formation of a savings bank and a commercial bank that were located in Los Angeles, California. While I did not serve on the board of directors of the savings bank, I provided advice involving staffing, capital and regulatory issues to directors and senior management. I was involved in the formation of a commercial bank – Bank of Los Angeles. At the Bank of Los Angeles, I was involved in the acquisition of another bank that was closed by state and federal regulators, purchased loans from the FDIC and the RTC. Issues involved in the acquisition included: deposit retention, deposit withdrawal requests, possible run on deposits, liquidity, borrower loan defaults and lender liability claims, performing and non-performing loans. It was a complicated process that worked out positively because well-defined business and strategic plans were quickly developed and implemented.

I was also approved by regulatory agencies to serve as the chief executive officer of a financially troubled bank, Center National Bank. This assignment resulted in the identification of significant additional problems within the bank that prior to my employment had not been CUSCed by either the bank's independent auditors or by the regulators. My duties included: Securities and Exchange Commission disclosures, valuation of the loan portfolio, amendment of financial reports, the sale of loans, shrinkage of deposits, capital infusion and implementation of new policies, procedures and controls.

Subsequent to First Alliance Mortgage Corporation ("FAMCO") filing for bankruptcy protection, I was approved and appointed with the concurrence of the board of directors, creditors and court to the board of directors of FAMCO which was a public, SEC reporting financial services company. I served during bankruptcy proceedings as its Audit Committee, Chair. I was also appointed to serve during reorganization on the board of directors of a regional retail company.

I have served as a director of the Western States Bankcard Association and as an advisor to various financial institutions and companies involving credit card, lender liability, TILA, and UDAP issues.

I have also been appointed to the panel of mediators by the United States Bankruptcy Court for the Central District of California.

**EXHIBIT B**

**List of cases that the expert witness has testified at trial, deposition, mediation or arbitration included the following:**

1. NNNRI v Todd Mikles, et al., Irvine, CA, Arbitration 11/23;

2. Chong v Experian, Honolulu, HI, Depo 10/23;

3. Johnson v Freedom Mortgage, Equifax and TransUnion, Case No: 21-cv-2760 (KMH/HB), Minneapolis, Minnesota, Depo 06/23;

4. Loretta Perry vs Luxury Auto Leasing, Interstate Automobile Network, Inc. et al. Case no: LAM1003CS0606, Los Angeles, CA, Trial 05/23;

5. George and Geri Calcut vs Paramount Residential Mortgage Group, Inc. and Cenlar FSB, Case no: 2:22-cv-0123-JJT, Phoenix, AZ, Depo 04/23;

6. Albert Smith vs Reliable Chevrolet, et al., Albuquerque, NM, Depo 03/23; Trial 09/23;

7. Christopher LaRocco vs Acima Credit, LLC, Houston, TX, Case no: 4:21-cv-1770, Depo 11/22;

8. Shara Bailey vs Experian, Boise, ID, Depo 11/22;

9. Ntam vs Paramount Residential Mortgage Group, Inc and Cenlar FSB, Washington D.C., Depo 08/22;

10. Nalbandyan vs Wells Fargo Bank, Los Angeles, CA, Arbitration, 07/22;

11. Yu vs Tesla, Equifax, et al, Los Angeles, CA, Depo 04/22;

12. Balboa Capital vs Adesomo, et al, Santa Ana, CA, Trial 03/22;

13. Larios vs SLS, Victoria Grantor Trust, et al, Los Angeles, CA, Case No. 18STCP02482. Depo 01/22, Trial 03/22;

14. Hill vs Ocwen, PHH, et al, Colusa, CA, CV24409,  Depo 01/22;

15. Tayyar, et al vs OneUnited Bank, Glendale, CA, BC533326, Depo and Trial 11/21;

16. Konig, et al. vs Bank America, n.a., Equifax, TransUnion, et al, SDNY, 7{18:cv-07299-JCM, Depo 11/21;

17. Ponce, et al. vs Wells Fargo Bank and Specialized Loan Servicing, Woodland, CA, CV-13:1769, Depo 10/20, Trial 9/21;

18. Kramer, et al vs MicroBilt, Equifax, et al, Los Angeles, CA, 5:19-1021-JGB(SPx), Depo 06/20;

19. Linda Musial vs Nationstar, et al., Riverside, CA, Depo 01/20; Trial 02/20;

20. Kato vs AutoNation, et al; Phoenix, AZ, Arb 01/20;

21. In re: Nicolas, Los Angeles, CA, 10/20 and 3/21;

22. In re: CSA and CFT, et al.; Los Angeles, CA; 1/20 and 5/20;

23. CLG, et al. vs Gunderson, Irvine, CA, Depo 11/19; Arb 12/19;

24. Franklin, et al. vs Midwest Recovery, et al.. Los Angeles, CA, 8:18-cv-02085-JLS-DFMx, Depo 11/19;

25. Cardenas vs Ally Bank, et al., Oklahoma City, OK, Depo 10/19;

26. Bryant vs Moto-Science, et al., Los Angeles, CA Depo 09/19;

27. Sponer vs Wells Fargo Bank, et al., Portland, OR, 3:17-cv-02035-HZ, Depo 7/19; Trial 08/19;

28. Neufeld vs Capital Bank, TransUnion, et al., Fresno, CA, 1:18 – cv – 01012 – LJO – SKO, Depo 7/19;

29. Cook vs Mountain America  Federal Credit Union, et al., Phoenix, AZ, Depo 3/19;

30. Hannah Weinstein vs Equifax, et al., Los Angeles, CA, 2-17-cv-8704, Depo 2/19;

31. Rowe vs Renovate America, et al., San Diego, CA, Arb 1/19;

32. Hernandez vs Ditech, SLS; et al., Glendale, CA, Depo 1/19;

33. Brainangkul vs SPS, et al., Glendale, CA, Depo 11/18;

34. Snyder vs Bank America, et al., San Francisco, CA, Depo 11/18;

35. Trabulsi vs Wells Fargo Bank, Los Angeles, CA, Depo 10/18;

36. Clark vs Vigil, Bakersfield, CA, Arb 6/18;

37. Luce vs Wells Fargo Bank, et al, San Francisco, CA, Depo 5/18;

38. Solenberger vs Northstar and Hillcrest Davidson, et al., Kansas City, KS, Depo 05/18;

39. Anderson vs Wells Fargo, et al., Dallas, TX, 3:16-cv-2514,Depo 04/18;

40. Altadena Lincoln Crossing, LLC. vs East West Bank, Los Angeles, CA, Depo 03/18; Trial 5/18, # 2:17-bk-14276-BB; Depo 12/18; Trial 1/19;

41. Hernandez vs Specialized Loan Service, San Bernardino, CA, Depo 03/18;

42. Kim vs PHEAA, et al; San Diego, CA, 17-cv-00528-WQH-AGS, Depo 02/18;

43. Yin vs Frontier Communications, et al, Los Angeles, CA, Depo 02/18;

44. Lafkas vs Lafkas, Los Angeles, CA, Depo 01/18; Trial 4/18;

45. Karapetyan vs US Bank, et al., Los Angeles, CA, Depo 01/18;

46. Robbins vs CitiMortgage, et al., San Francisco, CA, Depo 12/17;

47. TGV vs Conner, et al., Santa Ana, CA, Depo 12/17; Trial 5/18;

48. Manantan vs. Wells Fargo Bank, et al.., San Mateo, CA, Depo 11/17; Trial 03/18;

49. Favero, et al. vs. Stefanelli, et., et al., Colusa, CA, Depo 10/17;

50. GemCap, et al vs. Amalfi Capital, et al., Los Angeles, CA, BC522224, Depo 10/17;

51. Fredrickson vs Cannon Federal Credit Union, Albuquerque, NM, 2:16-cv-01012-SMV-CG, 06/17;

52. PHH vs Barrett, Daffin, et al., San Francisco, CA, Depo 6/17;

53. Al-Naswari vs FCI, et al, Anaheim, CA, Depo 3/17 and 06/17; Arb 03/18;

54. US Trust, et al vs Aroyan; et al, Irvine, CA; Arb, 01/17;

55. Weiss, et al vs Citibank; Los Angeles, CA; Depo 12/16;

56. Steiner vs Bank America. Bank New York Mellon, Bayview, et al; San Francisco, CA; Depo 11/16;

57. Krumpholtz vs Redondo Beach Board of Education; Los Angeles, CA, Trial 10/16;

58. Middleburg Bank vs Torus Law, et al; Richmond, VA, Depo 09/16; Trial 11/16;

59. Community Bank of Santa Maria vs Joni Gray; Santa Barbara, CA, Depo 07/16;

60. Dias vs PNC, et al, Auburn, CA, Trial 03/16;

61. Data Label vs  California Bank and Trust, Los Angeles, CA, Depo 3/16; Trial 03/17

62. Bresee vs Wells Fargo, et al, Phoenix, AZ, Depo 03/16;

63. Herrera vs AllianceOne, San Diego, CA; Depo 02/16;

64. Banneck vs Experian, HSBC, et al, Oakland. CA; 02/16;

65. Bodecker vs JPMorgan Chase, San Francisco, CA; Depo; 02/16;

66. Boston Private Bank vs. Foster Enterprises, et al., Depo, San Mateo, CA, 12/15;

67. Lawrence vs. J.D. Byrider, et al., Akron, OH, Arb. 12/15;

68. Jackson, et al vs. J.D. Byrider, et al., Cleveland, OH, Arb. 12/15;

69. People vs. Johnson, Santa Rosa, CA, Trial 8/15;

70. Kim vs BMW FS, et al., Los Angeles, CA, Trial 8/15;

71. Stansell vs Bank of America, et al., Marysville, CA, Depo 8/15;

72. Csmeezy, Inc. vs City National Bank, et al., Beverly Hills, CA, Depo 7/15;

73. Teamcare, et al. vs Wells Fargo Bank, et al., Los Angeles, CA, Depo 6/15;

74. Drakopoulos vs Credit Suisse, SPS, et al., Newberryport, MA, Trial 06/15 and 01/16;

75. Valdes, et al. vs Citibank, et al., Los Angeles, CA, Depo 05/15, 6/15; Trial 8/15;

76. Guerra, et al., vs Nationstar, et al., Sacramento, CA, Depo 04/15;

77. In re Tayyar, et al., Los Angeles, CA, Depo 04/15; Trial 05/15, # 2:13-bk-37454-WB;

78. Gustafson vs. SST, et al, Los Angeles, CA, Depo 03/15;

79. Thomasian vs Wells Fargo Bank, et al.  Portland, OR,  Depo  03/15;

80. MCWE vs Compass Bank, et al, San Diego, CA , Depo 02/15; Trial 8/15;

81. In re Duncan and Dirk, et al., Los Angeles, CA, Trial 12/14, # 2:14-bk-19628-ER;

82. Morvant vs Eastern Savings Bank, et al, Salt Lake City, UT, Depo 11/14; Trial 12/16;

83. Raima vs Wells Fargo Bank, Los Angeles, CA, Arb, 10/14;

84. In re Laube, et al., Woodland Hills, CA, Trial 10/14, # 1:13-bk-17331-VK and 17332-VK;

85. Linza vs PHH Mortgage, et al, Marysville, CA, Trial 07/14;

86. Corona, et al vs Heritage Oaks Bank, et al., Santa Barbara, CA, Depo 07/14; Trial 09/14;

87. Capil vs Mega Life, et al., San Jose, CA, Depo 06/14;

88. In re AJK Gadsen vs Sovereign Bank, et al, Woodland Hills, CA, Depo 05/14; Trial 06/14, Adv Case No. 1:13-ap-01174-MT (Related Bankruptcy Case No. 1:13-bk-12836-MT;

89. Carrillo vs Chase, et al,  Riverside, CA, Depo 04/14;

90. UGS vs Pacific Shores, San Jose, CA, Depo, 04/14;

91. In re Fox, Santa Ana, CA, Trial 01/14, # 8:11-bk-10501-ES;

92. Squatrito vs CSS, Chatsworth, CA, Trial 01/14;

93. In re Hargett, Santa Ana, CA, Trial 01/14, 8:11-bk-19495-TA;

94. In re Gonzalez, Santa Barbara, CA, Trial 12/13, # 9:12-14445-RR;

95. LWL Investments, LLC vs Universal Bank, et al., Los Angeles, CA, Depo 11/13;

96. Indymac Ventures, LLC vs Anyia, et al., Los Angeles, CA, Depo 10/13; Arb 10/13;

97. Peters vs Discover, et al., Los Angeles, CA, Depo 9/13;

98. In re Kerr, et al, San Diego, CA, Trial 06/13, # 12-90204;

99. In re Bacino, FDIC, as Receiver for La Jolla Bank vs Birger Greg Bacino, San Diego,;

100.    Laurelwood Group, LLC vs. East West Bank, et al., Los Angeles, CA, Depo 05/13;

101.    Verdiyan vs Capital One, et al, San Francisco, CA, Depo 04/13;

102.    In re: Ortega, Santa Barbara, CA, Trial, 3/13, # 9-10-bk-12324 RR;

103.    Bacarti vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

104.    Kim vs JPMorgan Chase, et al, Los Angeles, CA, Depo 3/13;

105.    Chang and Wong vs. Hanmi Bank, et al., San Jose, CA, Depo 2/13, Trial 06/13;

106.    Downs, et al vs. Wells Fargo Home Loan, et al., Reno, Nevada, NV, Depo 1/13;

107.    Gaudie vs Countrywide, et al., Chicago, IL, Depo 12/12;

108.    Evans vs Trope, et al, Los Angeles, CA, Depo 11/12;

109.    Khazra vs Shayan, Los Angeles, CA, Trial 10/12;

110.    FDIC as Receiver for Union Bank, N.A. vs Prudential, et al., Phoenix, AZ, Depo 8/12;

111.    FDIC as Receiver for La Jolla Bank vs O'Connor, et al., San Diego, CA, Depo 7612;

112.    The Preserve, LLC vs Centerpoint, et al,. Los Angeles, CA,  Depo 05/12, # 2:10-ap-01296-BB and 2-10-bk-18248-BB;

113.    Valencia Dodge vs Mikaelyan, Chatsworth, CA, Depo 04/12; Trial 10/12;

114.    In re: Krishan, LLC, San Jose, CA, Trial 04/12, # 10-50824-SLJ;

115.    Shoreline vs. Union Bank of California, Los Angeles, CA, Depo 04/12;

116.    Utah First Federal Credit Union vs. Federal Insurance, et al., Salt Lake City, UT, Depo 02/12;

117.    Lopez, et al., vs. Wells Fargo Bank, et al., Los Angeles, CA, Depo 02/12;

118.    Anderson vs. Chase, et al., San Diego, CA, Depo 01/12;

119.     United States vs. Sutherland, et al., Las Vegas, NV, Trial 01/12;

120.    Dillon vs. Chase, et al, Charleston, WV, Depo, 12/11; Trial 02/12;

121.    Triano vs. Summit Bank, et al, Oakland, CA, Depo 11/11;

122.    Wells Fargo Bank vs White, Los Angeles, CA, Depo 11/11; Trial 05/12

123.    Oxford Street Properties, LLC vs. Lance Robbins, et al, Depo 10/11;

124.    In re: Tarkanian, et al,. San Diego, CA, 09/11, # 10-cv-0980-WQH(BGS);

125.    Mueller vs Wells Fargo Bank, San Francisco, CA, Trial 09/11;

126.    Amezcua, et al vs. East West Bank, San Jose, CA, Depo 08/11; 09/11;

127.    In re: The Preserve, LLC, Los Angeles, CA, Depo 08/11; Trial 08/11 and 10/11, # 2:10-ap-01296-BB and 2-10-bk-18248-BB;;

128.    Kim, et al vs. CCU, et al, Las Vegas, NV, Depo 07/11;

129.    Jacob vs. SDG&E, San Diego, CA, Mediation, 06/11;

130.    TomatoBank vs East West Bank, Los Angeles, CA, Depo 07/11;

131.    Held vs. Gilmore Bank, Santa Ana, CA, Depo ,06/11; Trial 07/11;

132.    Trapasso and Justice vs Romero, et al, Stockton, CA, 05/11;

133.    In re: Pacific Allied, Los Angeles, CA, Trial 03/11, # 2:10-bk-42788 BB

134.    Price vs Eller, et al. Riverside, CA, Trial 03/11

135.    John Doe vs Church of Latter Day Saints, et al; Los Angeles, CA, Depo 02/11

136.  Empire Merchandizing vs. Bank Rhode Island, Providence, Rhode Island, Depo 02/11; Trial 02/11.

137.  United States of America vs. 718 West Wilson, et al, San Diego, CA, Depo 01/11

138.  Dufour vs. Informative Research, et al, Garden Grove, CA, Depo 01/11

139.  Amex vs Alexander Max, et al, Rockville, MD, Depo 10/10

140.  Umpqua Bank vs Larmont, et al, Sacramento, CA, Depo 10/10

141.  In Re:  Mammoth Arrowhead 1, LLC, Phoenix, AZ, Trial 09/10,

142.  D. Alexander vs Anderson, et al, Los Angeles, CA, Depo 08/10

143.  In re: Quarry Pond, LLC, et al, San Francisco, CA, Trial 06/10, # 09-33426

144.  Abdi vs Mulhearn, et al, Los Angeles, CA, Arb 06/10

145.  Lovett vs Citibank, et al, Los Angeles, CA, Depo 05/10; Trial 10/10; 5/12

146.  Charon Solutions, Inc. vs Jensen, et al, Los Angeles, CA, Depo 05/10

147.  Faye Estates, LLC vs Eastern Savings Bank, Los Angeles, CA, Depo 04/10; Trial 04/13

148.  Zey vs Dyck-O'Neal, et al, St. Louis, MO, Depo 04/10

149.  In re: Mendoza, et al, Santa Rosa, CA., Trial 04/10, # 09-11678-AJ

150.  In re: Bacchus, et al, Santa Ana, CA, Depo 02/10; Trial 02/10, Case Number: 08 - 197457-RK jointly administrated with Case Numbers: 8:09-19450-RK and 8:09-15462-RK

151.  Matthews vs Chase, et al, Jacksonville, FL, Depo 02/10

152.  DeWitt vs Monterey Insurance company, et al., San Diego, CA, Depo 02/10; Trial 04/10

153.  Jung vs Hamni Bank, et al., Los Angeles, CA, Depo 01/10

154.  Garcia vs Triton Acceptance, Los Angeles, CA, Depo 12/09; Trial 12/09

155.  CNA, et al vs Lloyds, et al, Chicago, CA, Depo 11/09

156.  Hickerson vs Financial Freedom, et al, Ventura, CA Depo 11/09; Trial 09/11;

157.  Perry vs Mega Life, et al., Phoenix, AZ, Depo 11/09

158.  In re: McBride's RV Storage, LLC., Riverside, CA, Depo 10/09; Trial 10/09, # 6:09-bk-11279-BB

159.    Cartwright vs CMI, WSFS, Experian, et al. Los Angeles, CA, Depo 09/09; 10/09; 12/09

160.    Miller, et al vs. Norton Financial, Greer, Safe Harbor Financial, et al. San Diego, CA, Depo 09/09; Trial 05/10

161.    Petty vs Petty, Jackson, CA, Trial 08/09

162.    Marcus vs Vorspan, et al, Los Angeles, CA, Depo 07/09; Arb 08/09

163.    Hwang vs Fang Fashion, et al, Los Angeles, CA, Depo 06/09

164.    Elie vs Smith, San Mateo, CA, Depo 06/09

165.    In re Waterstone, LLC, et al, Reno, NV, Trial 06/09. # BK-N-08-50954-GWZ

166.    Heil Construction, Inc., vs Security Pacific Bank, et al., Bakersfield, CA, Depo 05/09

167.    UJV, et al vs Lewis, Jennings, Ross, et al. Grand Rapids, MI, Depo 02/08; Trial 04/09

168.    Blackburn vs. Duckor, et al, San Diego, CA, Dep 03/09; Arb 03/09

169.    Holly Young vs Bigelow, Los Angeles, CA Depo 03/09; Trial 06/09

170.    Levenson vs WaMu, et al., Los Angeles, CA, Depo 01/09; Arb 05/09

171.    Drury - Countrywide, et al., Tampa, FL, Depo 10/08

172.    Karen Cappuccio vs Countrywide, et al, Philadelphia, PA, Trial 09/08

173.    Mark Anderson vs WaMu, et al, San Diego, CA, Depo 09/08

174.    Ellis vs PHEAA, KeyBank, et al, Los Angeles, CA, Depo 07/08

175.    Quinn vs Cherry Lane Auto, et al, Spokane, WA, Trial 06/08

176.    In re I-5 Social Services Corporation, Debtor, Fresno, CA, Depo 05/08, # 07-13032-A-11

177.    Walsh et al vs Bank of Petaluma, et al, Santa Clara, CA, Depo 04/08; Trial 09/08

178.    Gorman vs HSBC, Experian, et al, New York, NY, Depo 04/08

179.    Shokatz vs Better Business Financial Services, Kelly Lucas & Pacifico LLP, et al, Milwaukee, WI, Depo 03/08

180.    Austin vs HSBC, et al, San Diego, CA, Depo 03/08

181.    Melton vs Friend, et al, Santa Ana, CA, Depo 01/08

182.    OES vs West Coast Bank, et al, Portland OR, Trial 01/08

183. Michigan First Credit Union vs CUMIS, et al, Detroit MI, Depo 12/07; Trial 01/09

184. Ligon vs Chase, et al, Dallas, TX, Depo 11/07

185. Williams vs. AutoNation, Los Angeles, CA, Depo 11/07; Trial 12/07

186. Weldon vs. Launch Marketing Concepts, Inc., Los Angeles, CA, Depo 11/07; Arbitration 12/07

187. Arnold vs LNR, Los Angeles, CA, Depo 10/07

188. Squirty's Collision, et al vs Finishmaster, et al, Depo 09/07; Trial 09/07

189. Casey vs US Bank, et al, Santa Ana, CA, Depo 09/07; Trial 10/07

190. Nardelli vs MetLife, et al, Phoenix, AZ, Depo 09/07; 08/08; Trial 03/09

191. Cha, et al vs WFB, et al, Los Angeles, CA, Depo 08/07; Trial 09/07

192. Ho, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo 08/07; Trial 08/08

193. Ott vs Markley Group, et al, Los Angeles, CA, Depo 06/07

194. Hayden vs. Hayden, Los Angeles, CA Arbitration 05/07

195. Nelson vs. Arrow Financial Services, et al, Los Angeles, CA, Depo 04/07; Trial 05/07

196. Foppiano vs. Union Bank of Stockton, et al, Sacramento, CA, Depo 04/07

197. Board of Health Dept vs Virginia Jefferies, et al, Mansfield, OH, Depo 04/07

198. DeLuna vs Bank America, Los Angeles, CA, Depo 12/06; Trial 06/07

199. Pertiera vs Bank America, Los Angeles, CA, Depo 12/06

200. United States vs. Flores, Los Angeles, CA, Trial 12/06

201. Lehman vs Net Bank, et al, Indianapolis, In, Depo 12/06

202. Kay vs. Washington Mutual, et al., Sacramento, CA, Depo 09/06

203. Loudd vs. Weston, Conseco, GreenTree, et al., Los Angeles, CA, Trial 09/06

204. Associated Bank, et al vs Brady Martz, Minneapolis, MN, Dep 0906

205. Satey vs Chase Manhattan Bank, et al, Los Angeles, CA, Dep 08/06

206.  1124 Marylin Drive Development, LLC vs Elyaszadeh, Los Angeles, CA, Dep 04/06; Trial 07/06

207.  Paradigm Industries, Inc. vs Yang, Wells Fargo Bank, et al., Los Angeles, CA, Dep 03/06; trial 04/06

208.  Bank of America vs Mark Guzy, et al, San Francisco, CA, Dep 03/06

209.  First State Bank of Taos, et al. vs Close, Albuquerque, NM, Dep 02/06

210.  Neumann, et al. vs. Friedland, et al, San Jose, CA, Dep 02/06

211.  Babijian, et al vs Union Bank of California, Los Angeles, CA, Dep 01/06

212.  Bistro Executive, Inc., et al, vs Rewards Network, Inc., et al, Dep 01/06

213.  Lu, et al, Los Angeles, CA, Arbitration, 11/05

214.  Fisher vs Wells Fargo Home Mortgage, et al, Los Angeles, CA Dep 11/05, Trial 04/07

215.  Turner vs Washington Mutual, et al, Los Angeles, CA Dep 11/05

216.  Accurate Air Engineering vs Bank of America, Los Angeles, CA, Dep 11/05

217.  Las vs Washington Mutual, Las Vegas, NV, Dep 09/05, Arbitration 01/06

218.  Dante Valve Company, Inc, et al vs Bank of America, Los Angeles, CA, Dep 08/05

219.  Amada America, et al vs Bank of America, Los Angeles, CA, Arbitration, 05/05

220.  Green vs Vars, et al, Los Angeles, CA, Dep 04/05

221.  White vs White, et al, Riverside, CA, Dep 03/05

222.  Sherman, Abrunzo vs Stricklands, Aaron & Jacqueline and Estate of Albert Thompson, et al, Chatsworth, CA, Trial 02/05, No. PC 033244-V

223.  Harman vs California Federal Bank, et al, Van Nuys, CA, Dep 1/05, Trial 2/05, No. LC059430

224.  Reizian vs Mehrdad Arya, Global Capital Group, Inc,, The Escrow Group, et al, San Diego, CA, Trial 02/05, No. GIC 819536

225.  Barry vs California Bank and Trust, et al, Orange County, CA, Dep 01/05, No. 04CC04393

226.  Norma Berneman, et al vs. Ira Shear, Bank of America, et al, Los Angeles, CA, Dep 9/04 BC 278 601

227.   Invelj, Inc. vs AMK Management, Inc., et al, Van Nuys, CA, Trial 07/04 02E08010

228.   Federal Insurance Corporation and Plum Creek Marketing, et al vs Bank America, Cal Fed, et al, Ventura, CA, Dep 06/04 CIV 215700

229.   Barbara San Martin vs. Antioch Credit Union, Martinez, CA, Dep 05/04

230.   Humbolt Bank, et al  vs Gulf Insurance Company, San Francisco, CA, Dep, 05/04 C03-1799 SC ARB

231.   Vasquez, et al vs Beneficial Finance, Portland, OR, Trial 01/04

232.   United Grand vs Farmers & Merchants Bank, et al, Long Beach, CA, Dep 01/04, No. BC296270

233.   Commercial Programming Systems, Inc. vs Briggs & Baker, et al, Los Angeles, CA, Dep 12/03; Trial 02/04

234.   Ferrera vs Henry C. Hansel, Inc., et al, Santa Rosa, CA, Dep 12/03, No. 231480

235.   Beach, et al vs Bank of America, et al, San Francisco, CA, Dep 11/03

236.   Aquino vs Providian, Fresno, CA, Madera County No. CV18758, Dep 10/03

237.   Martinez vs Onyx Acceptance Corporation, et al, Fresno, CA, Trial 8/03

238.   FFS, et al vs Bank of Saipan, Abilene, TX, Dep 7/03; Trial 04/05

239.   SoCal Housing Partners, LLC vs Gregory S. Hancock, Darrell Hoover, et al, Los Angeles, CA, Depo 6/03

240.   Anthony Kalajian vs. Patricia Dubon, Aames, et al, Los Angeles, CA, Dep 5/03

241.   Wells Fargo Bank vs Peter Knibb, et al, Los Angeles, CA, Dep 5/03

242.   Spectrum Glass and Aluminum, Inc., et al vs People's Bank of California, et al, Los Angeles, CA, No. EC – 033501, Dep 3/03

243.   Nilchin vs Cohen, et al, Los Angeles, CA, Trial 3/03

244.   Luther vs Bank of America, Moreno Valley Honda, et al, Riverside, CA, Dep 01/03

245.   Corbett vs Bank of America, Hayward Dodge, et al, Oakland, CA, Dep 11/02, 12/02

246.   Costa vs Fresno Surgery Center, et al, Fresno, CA, Dep 10/02; Trial 11/02

247.   Bank of America, et al vs Prime One Capital, Bridgeport, CN,  Federal Court, Trial 10/02

248.   California Federal Bank vs Russell Crawford, et al, Los Angeles, CA, No. BC – 144590, Trial  9/02

249.   INET Interactive Network System, Inc., Debtor-in-Possession, Plaintiff, vs Global Crossing Bandwidth, Inc., fka Frontier Communications of the West, Inc., Defendant, No. LA 01-13671-KM, Dep 9/02

250.   Alaska Petroleum Environmental Engineering vs Antiquarian Traders, et al, Los Angeles, CA, No. LASC BC 260006, Trial 8/02

251.   Global Interactive Marketing, et al. vs Joseph Clark, United Nevada Trade International, et al., Los Angeles, CA, No. SC 059148, Dep 7/02, Trial 3/03

252.   Grumbo vs Bretz, Los Angeles, CA, No. SC 059095, Dep 7/02

253.   Sam Carroll and GOCO Acquisition Corp. vs German American Capital, et al., Birmingham, AL, No. 01-T-981-5, Federal Court, Dep 6/02

254.   Duran. vs. Citicorp, Santa Clara, CA, No. CV-790369, Dep 6/02

255.   Fyke and Falcone vs. Screen Shop, Santa Clara, CA, Trial 5/02

256.   Bill's Quik Stop vs West America Bank, et al., Fresno, CA, Dep 5/02

257.   Krantz vs Philpott, et al., Los Angeles, CA, Dep 1/02

258.   Bank of America vs San Ramon Carriage Co., Inc., et al, Contra Costa County, CA, No. C00-04854, Dep 10/01; Trial 11/01

259.   David Kim vs California Korea Bank, No. BC108719, Los Angeles, CA, Trial 8/01

260.   Spring Mountain Homes, et al vs Upland Bank, American Arbitration Association No. 72-110 00981, Upland Bank - MJE, Los Angeles, CA, Arbitration 8/01

261.   Viva Tiger, Inc. vs Cathay Bank, Pasadena, CA, Dep 6/01, Trial 7/0;

262.   Marine Village Townhomes Association vs Hawthorne Savings and Loan, No. YC 032 949, Los Angeles, CA, Dep 5/01;

263.   Abatti vs Floyd, et al, Imperial, CA; SC case No. 89994Dep 3/01, Trial 5/01;

264.   Lee vs Bank of America, Los Angeles, CA; Dep 1/01, Trial 2/01;

265.   EIE Guam Corporation vs The Long Term Credit Bank of Japan, Ltd., et al., United States District Court of Guam, Territory of Guam, No. 00-00009; Dep 11/00; 12/00;

266.   In re:  Cimms, et al, Los Angeles, CA;

267.   Kroupa vs Sunrise Ford, AT&T, et al, Los Angeles, CA; ECO 14965, Trial 11/00

268.   Reyes vs Car Gallerie, et al, United States District Court, Los Angeles, CA;  CV -00-5673-MWB;  Trial 10/00

269.   Bank of America vs Larry Whithorn; Riverside, CA, RIC 310840; Dep 9/00

270.   Kane vs Capital One, et al; GIC733574; San Diego, CA; GIC 733574; Dep 8/00

271.   Larry Nix, et al vs Westcorp, et al.; Los Angeles, CA; BC 204188; Dep 8/00

272.   Coast Business Credit vs Roger Hay, Ken Campbell, et al.; Orange County Superior Court; No. 787394; Dep 5/00

273.   Hanna vs American Dream Equity Home Loan Corporation; Los Angeles, CA; EC026426;   Dep 2/00

274.   Life Benefactors, LP vs Transamerica, et al;  San Diego, CA;  723176;  Dep  1/00;  Trial 3/00

275.   Peter Ligeti vs Advanta National Bank;  Santa Clara, CA;  CV 770626;  Dep 11/99

276.   Ambriz, et al vs Greentree Financial;  Elko, NV;  #29128;  Dep 10/99;  Trial (A) 11/99

277.   In re: Nellis Arms Apartments;  Las Vegas, NV;  99-12278 LBR;  Dep 9/99;  Trial 9/99

278.   B&B Sons Enterprises, Joseph and Nancy Benvenuti vs La Salle National Bank, et al; Sacramento, CA;  # 74-Y148-0181-98;  Dep  6/99;  Trial (A)  6/99

279.   Davina Willis vs J. G. Wentworth SSC;  San Francisco, CA;   Dep  8/99

280.   Davis vs A&L, et al;  Riverside, CA;  273753;  Dep  6/99

281.   In re:  Crystal Properties, Ltd;  San Fernando Valley, CA;  SV 97-18796-KL; Dep 5/99; Trial  7/99

282.   In re:  Maroa Park Apartments;  Modesto, CA;  98-95624-A-4;  Dep 6/99;  Trial  8/99 `

283.   Ohai vs WHC-Three Investors, The Archon Group, et al;  Los Angeles, CA; AAA Case No 72-1480039098;  Trial (Arbitration)  3/99

284.   In re: Florence, et al;  Las Vegas, NV;  Dep  1/99

285.   Ambassador Hotel Co. LTD vs Wan Yuan Lin, et al;  Los Angeles, CA;  No 176479; Dep  2/99

286.   Wendell vs Wells Fargo Bank; San Francisco, CA;  983597;  Dep 4/99

287.   Bragg vs Hawthorne Savings Bank;  Los Angeles, CA;  Trial  11/98

288.   Rosario Sobremonte; Amparo Esperidion, et al vs Bank of America;  Los Angeles, CA;  BC 127133;  Dep 9/98

289.   Finnocario, et al vs Wells Fargo Bank, et al, Los Angeles, CA, Depo est 09/98

290.   Yang, et al vs Bank of America;  Los Angeles, CA;  Los Angeles;  VC 020377;   Dep 3/98 est

**291.**   EMC Mortgage Co., et al vs Christensen, et al;  Fresno, CA;  Trial 2/97 est

292.   Fuchs and Marshall, et al vs Hwai-Tang Chen, et al ;  Santa Monica, CA;  SC047845;  Trial 11/98 est

293.   Union Oil Company of California vs Mobil Oil;  Los Angeles, CA;  Dep 10/98est;  Trial 11/98 est

294.   Tillman Fabric, Inc vs New Progress Enterprise Co., et al;  Los Angeles, CA;  BC 161449;  Trial   7/98

295.   Budak vs Grossman;  Los Angeles, CA;  Dep --/97 est;  Trial (Arbitration)  --/98

296.   Imperial Bank vs Robert Selan, et al; Los Angeles, CA;  LC038665;  Dep --/98 est

297.   Sukow vs Republic Western Insurance Company, et al;  Los Angeles, CA;  BC 142792;  Dep --  /98 est

298.   In re. Silveira, et al;  Modesto, CA;  96-92575;  Trial  11/96

299.   In re. Playa Pacifica, et al;  Santa Ana, CA;  SA96-11937-JW;  Dep 10/96

300.   Federal Deposit Insurance Corporation vs BMB Properties, et al: Los Angeles, CA;  C 669033 consolidated into C 669294;  Dep 8/97;  Trial 9/97

301.   Quiter/Nikkel vs Watsonville Cogeneration Partnership, State Street Bank and Trust Company of California and Ford Motor Credit Company, et al;  San Francisco, CA;  969360;  Dep 5/97;  Trial   6/97

302.   Takaki vs Hawthorne Savings Bank;  Los Angeles, CA;  YC 021815 Dep  4/97 est. and 2/99;  Trial  6/97 and 3/99

**303.**   The Official Oversight Committee vs Levene & Eisenberg, Alliance Bank, et al; Santa Barbara, CA;  213552;  Dep  10/97

304.   Bilma Sadah vs Wells Fargo Bank, Chemical Bank, et al  Los Angeles;  YC 025096; Dep 10/98 est;  Trial 3/99

305.   Kertesz vs Home Savings of America; Santa Monica, CA; SC 037986; Dep  9/97

306.   O.T. vs Valle Verde Foods; Los Angeles, CA; Trial (Arbitration) 11/97 est

307.  Monarch Bank, et al; Santa Ana, CA; Dep 6/97

308.  Patel vs Pacific Inland Bank; Los Angeles, CA; LC 018345;  Dep 97 est

309.  Hughes vs Home Savings Association, et al; Santa Barbara, CA; 211477; Dep 1/97; Trial 3/ 97

310.  Beck Oil, Inc vs Bank of America; Los Angeles, CA;  Dep 2/97;  Trial 3/97

311.  In re: Hansohl, Inc., et al; Los Angeles, CA;  Dep  1/97

312.  Tokai Bank of California vs KSS Real Estate Group, et al;  Los Angeles, CA; BC131203;    Trial 6/96

313.  Powertrain, et al vs Haifa; Santa Ana; CA;  Trial  7/96 est

314.  In re: Maulhardt Industrial Center; Santa Barbara, CA; ND 95-15475-RR;  Trial   5/96

315.  Guny vs Lieb, et al;  Ventura, CA;  114052;  Trial --/96

316.  Tillack & Co., Ltd vs Diane Tubergen, Wells Fargo Bank, The Sanwa Bank of California, et al BC   058825; Los Angeles, CA; Dep --/94;  Trial (Arbitration) 4/96 est

317.  Timothy Watson vs The Downey Venture, et al; Los Angeles, CA;  BC   098430; Dep --/96 est

318.  Farnon vs World Savings, Santa Monica Bank, Argus, et al;  Los Angeles, CA;  LC 022237;  Dep 5/95:  Trial  7/95

319.  First American Title Company vs Bank of America, et al;  Los Angeles, CA;  BC 098416  Dep est. 1995

320.  Hanmi Bank vs Kim, You, et al;  Los Angeles, CA;  Dep  --/95

321.  Mosely vs Farmers and Merchants Bank; Los Angeles, CA;  NC 012950; Dep --/95 est

322.  Pelletier vs Behrens, et al; Los Angeles, CA;  CV   890969-RMT    Dep est 1995; Trial 11/99

323.  In re. Gatway Properties, et al  and  The  Alicante Management Co, et al; Santa Ana, CA; SA95-10963JR and 95-12694JR;  Trial est 95

The aforementioned list may be supplemented in the event that a matter(s) was inadvertently omitted.  Dates have been estimated to the best of my recollection.

# EXHIBIT C

**The Andela Consulting Group, Inc.**
**18783 Tribune Street**
**Northridge, CA 91326**

**Thomas A. Tarter**                                         **Telephone: (818) 488 9101**
**Managing Director**
**Expert Witness – Banking**                                 **E-Mail**: ttarter@earthlink.net
**Consulting – Financial and Management**                    **Web Page www.andelaconsulting.com**

# EXPERT WITNESS CONSULTING AGREEMENT

# Banking, Credit Industry Practices and Damages

# The Andela Consulting Group, Inc.
18783 Tribune Street
Northridge, CA 91326

**Thomas A. Tarter**                                                        **Phone: (818) 488-9101**
**Managing Director**
**Expert Witness – Banking**                                    **E-Mail**: ttarter@earthlink.net
**Consulting – Financial and Management**

Re:

Date:                         , 2023

This EXPERT WITNESS CONSULTING AGREEMENT ("Agreement") is intended to confirm The Andela Consulting Group, Inc.'s ("Andela") engagement as set forth in this Agreement.

1.    Andela will provide Expert Witness or Litigation Consulting Services on behalf of _____("Client").

2.    Andela, Thomas A. Tarter and any person or entity affiliated with Andela will be an independent contractor and not an employee, beginning on the date of this Agreement but terminable at will.

3.    Client will provide full access to all personnel and all books and records under its attorney's, or any of its other attorneys, control that may be requested by Andela that are applicable to this matter.

4.    Andela's fees are: Thomas A. Tarter - $295.00 per hour for: investigation, research, preparation or consultation, and $495.00 per hour for arbitration, deposition testimony or any court appearances. Other members of Andela may be billed at their standard rates ranging between $95.00 and $250.00 per hour for services rendered. There are no minimum charges for deposition and/or court appearances. Depositions and Court appearances will take place in Northridge, CA via Zoom or electronic means due to my physical condition and COVID-19.

5.    Client agrees to reimburse Andela for all reasonable and necessary business-related expenses. Andela will call Client to get specific verbal advance approval of any cost item expected to be more than $250.00.

6.    Non-detailed statements of time and detailed statements of any fees or costs will be sent to you periodically and payment is anticipated ten (10) business days after the bill is received.

7.    At the time that this Agreement is signed and returned to Andela, a mutually agreeable retainer of $_____ is requested. The retainer is intended to be a "stay ahead" retainer and once used will be requested to be replenished, likewise any unused portion is refundable. It would be appreciated that all unpaid fees and expenses will be paid prior to any deposition or court testimony.

8.    No other fee or cost arrangements are expressed and/or implied and it explicitly understood that there is no contingency fee based on the outcome of this case.

9.    The results and scope of research, evaluation and conclusions, and the outcome of any litigation or claim are uncertain. Therefore, no limitations, timing, results, representations, warranties or guarantees are expressed or may be implied.

10.    Client shall indemnify and hold Andela, Thomas A. Tarter or any person or entity affiliated with Andela, and Thomas A. Tarter hold them free and harmless from any claims, costs, including but not limited to legal fees which may arise from what they in good faith believed to be appropriate analysis and/or testimony.

11.     Except to the extent necessary to properly perform their duties, Andela agrees to keep confidential all documents and/or information revealed to it.

12.     This Agreement contains the entire agreement between Andela and the Client.

13.     If it becomes necessary to employ attorneys to enforce any part of this Agreement, the prevailing party shall be entitled, to its reasonable attorney's fees and costs.

14.     This Agreement may be executed in counterparts, each of which shall be an original, and all of which taken together, shall constitute the entire instrument.

15.      If, within ten (10) days of the date of this Agreement, it shall not have been executed and returned, this Agreement shall be void and of no force or effect.

16.     Andela's taxpayer identification number is 95-4511452.   Andela is not subject to back-up withholding.  Please make all checks payable to The Andela Consulting Group, Inc. and mail them to the address listed above.

This Agreement has been executed as of this  __ day of  _____ , 2022.

<u>Client or its Authorized Representative</u>

By:_____

<u>Andela Consulting Group, Inc.</u>

By: _____